[Crim. No. 23248. Dec. 8, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
ALLAN DALE LOEWEN, Defendant and Appellant.

120

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Landra E. Rosenthal and George L. Schraer, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ronald E. Niver and Richard G. Tullis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BIRD, C. J.**—May a police officer, consistent with the Constitution, stop a vehicle because he suspects the driver is an associate of another individual who is being investigated for a parking violation in a "high crime area"?

### I.

On April 14, 1982, Lake County Sheriff's Deputy Steven Cozart was on duty as a uniformed officer in a marked patrol car. At approximately 2 p.m., Cozart saw a blue Ford Cortina illegally parked and blocking access to a dirt side road. A young man was sitting on the hood of the car. The car had red bandanas covering the taillights.

Cozart stopped and approached the man, who identified himself as Thomas Landrum. Cozart asked Landrum to move the car, and he agreed to do so. When questioned, Landrum stated that he was waiting for "Bub" or "Bubby," who had driven into a nearby housing development to collect money owed him by one of the residents. Landrum had been asked by Bub to stay behind because Bub's friend did not like strangers to know where he lived. Landrum did not know Bub's last name or the name of the Bub's friend, but described Bub's vehicle as a yellow Datsun pickup. Cozart testified that Landrum's hands were shaking and that he looked at the ground as he was talking.

A warrant check was run on Landrum and his car, with negative results. As Cozart was instructing Landrum to move his car, a yellow Toyota pickup containing two persons approached at a normal rate of speed. As the truck drove past, both occupants looked toward Cozart and then looked away. The truck accelerated and continued down the street. Cozart noted the license plate number and asked Landrum if that was his friend. Landrum stuttered and then replied that it was not. He told the officer that Bub had long hair and a beard and that his vehicle was a Datsun and had a metal rack on the back. The driver of the pickup was clean shaven, and the vehicle had no such rack.

Cozart testified that he had no intention of arresting Landrum or giving him a citation for illegal parking or a possible equipment violation. Landrum was neither cited nor detained further. Instead, Cozart got into his patrol car, turned around, and pursued the pickup. En route, he radioed in a warrant check on the pickup's license plate number. The warrant check came back "clear" and revealed that the owner of the truck was an Allan Loewen who lived in Clear Lake. Failing to find the truck, Cozart radioed Officers Carl Stein and Wesley Frey to come to the area.

Cozart then stopped to telephone the sheriff's substation, which put him in contact with Officer Stein.[1] Cozart gave Stein additional details concerning Landrum, including the license number and ownership of the pickup truck. A request was made that the truck be stopped "for identification purposes."

Officers Stein and Frey were in plainclothes and travelling in an unmarked police car. They spotted the yellow truck and followed it for approximately seven miles. No vehicular violations were noted during this time. Finally, the officers stopped the pickup, and requested identification from the driver and his passenger. A subsequent consent search turned up a sawed-off shotgun and two stolen chain saws.

Appellant, the driver of the truck, was charged with receiving stolen property (Pen. Code, § 496[2]), possession of a sawed-off shotgun (§ 12020), and possession of a firearm by an ex-felon (§ 12021). Motions to suppress evidence and to set aside the information (§§ 1538.5, 995) were denied by the court, and appellant pled guilty in a negotiated settlement to receiving stolen property. All the other charges were dismissed. In this appeal, appellant challenges the denial of his pre-plea motions. (§ 1538.5, subd. (m).)

II.

■ ■■■ Appellant contends that the officers had insufficient justification to stop his vehicle and search it.[3] Since the stop was unlawful, he argues, the fruits of the consent search conducted subsequent to the stop

---

[1]Before stopping, Cozart passed Landrum's car going the other way on the highway and saw it turn onto another road. Cozart drove about two miles further but failed to see either Landrum's vehicle or the yellow truck. He thereafter abandoned the search for either vehicle.

[2]All statutory references are to the Penal Code unless otherwise indicated.

[3]At oral argument, respondent argued that a consensual encounter rather than a detention had occurred. Ignoring for the moment the procedural irregularity in advancing this contention for the first time on appeal (*People* v. *Smith* (1983) 34 Cal.3d 251, 270-271 [193 Cal.Rptr. 692, 667 P.2d 149]; *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640-641 [108 Cal.Rptr. 585, 511 P.2d 33]), this court finds that it lacks merit.

After following appellant's truck for seven miles without incident, Officers Frey and Stein activated the red spotlight on their unmarked police car, at which time appellant crossed the highway, stopped, and parked the truck in front of a local cafe. When appellant got out, he walked in Frey's direction with identification in hand, eventually meeting him at the rear of the truck. These actions would have unequivocally indicated to a reasonable person that he was neither free to continue driving along the highway nor to enter the cafe. (See *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, 789-790 [195 Cal.Rptr. 671, 670 P.2d 325]; *United States* v. *Mendenhall* (1980) 446 U.S. 544, 554 [64 L.Ed.2d 497, 509, 100 S.Ct. 1870] [opn. of Stewart, J.].) Moreover, because it was clear that the truck was ordered stopped "because [Deputy Cozart] suspect[ed] [appellant] may [have been] personally involved in some criminal activity," appellant's Fourth Amendment rights were implicated. (*In re Tony C.* (1978) 21 Cal.3d 888, 895 [148 Cal.Rptr. 366, 582 P.2d 957].)

should have been suppressed. (*People* v. *Haven* (1963) 59 Cal.2d 713, 718-719 [31 Cal.Rptr. 47, 381 P.2d 927]; *People* v. *Franklin* (1968) 261 Cal.App.2d 703, 707 [68 Cal.Rptr. 231]; see also *Wilson* v. *Superior Court, supra,* 34 Cal.3d at p. 791, fn. 12; cf. *Florida* v. *Royer* (1983) 460 U.S. 491, 499-502 [75 L.Ed.2d 229, 238-239, 103 S.Ct. 1319].)

■ The law is well-established that "in order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience (*People* v. *Superior Court (Kiefer)* [1970] 3 Cal.3d [807,] 827 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]), to suspect the same criminal activity and the same involvement by the person in question. ■ The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. (*Terry* v. *Ohio* [1968] 392 U.S. [1,] 22 [20 L.Ed.2d (889,) 906-907 (88 S.Ct. 1868)].)" (*In re Tony C., supra,* 21 Cal.3d at p. 893, fn. omitted; see also *Reid* v. *Georgia* (1980) 448 U.S. 438, 440 [65 L.Ed.2d 890, 893, 100 S.Ct. 2752]; *Brown* v. *Texas* (1979) 443 U.S. 47, 51 [61 L.Ed.2d 357, 362, 99 S.Ct. 2637].)

■ An appellate court's review of a motion to suppress evidence is also governed by well-settled principles. The trial court's factual findings relating to the challenged search or seizure, "whether express or implied, must be upheld if they are supported by substantial evidence." (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) " 'The trial court also has the duty to determine whether, on the facts found, the search was unreasonable within the meaning of the Constitution.' (*Ibid.*) Because 'that issue is a question of law,' the appellate court is not bound by the substantial evidence standard in reviewing the trial court's decision thereon. Rather, . . . in such review it is 'the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness.' (*Ibid.*) On that issue, in short, the appellate court exercises its independent judgment." (*People* v. *Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961], fn. omitted, quoting *People* v. *Lawler, supra,* 9 Cal.3d at p. 160.)

■ Here, the facts are undisputed. Deputy Cozart's decision to detain the truck via Officers Stein and Frey was based upon his "feeling" that its

occupants had been involved in criminal activity. However, Cozart's good faith suspicions—aroused, as they were, in the absence of any reports linking any of the individuals involved here to specific criminal activity—fell short of the constitutional standard of reasonableness necessary to justify a detention.

At the hearing, Cozart offered four reasons in support of his decision to detain the truck: (1) an increase in the incidence of thefts in the area, (2) Landrum's nervous behavior, including the explanation for his presence and his denial that "Bub" was in the passing truck[4]; (3) the similarity between the yellow Toyota and "Bub's" vehicle as Landrum had described it; and (4) the manner in which the occupants of the pickup reacted as they passed the officer. Each of these factors will be considered in turn.

■ Reliance on the "high rate of crime" in the area must be rejected. An "officer's assertion that the location lay in a 'high crime' area does not elevate . . . facts into a reasonable suspicion of criminality. The 'high crime area' factor is not an 'activity' of an individual. Many citizens of this state are forced to live in areas that have 'high crime' rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas. As a result, this court has appraised this factor with caution and has been reluctant to conclude that a location's crime rate transforms otherwise innocent-appearing circumstances into circumstances justifying the seizure of an individual. [Citations.]" (*People* v. *Bower* (1979) 24 Cal.3d 638, 645 [156 Cal.Rptr. 856, 597 P.2d 115]; see also *Brown* v. *Texas, supra,* 443 U.S. at p. 52 [61 L.Ed.2d at pp. 362-363].) Clearly, it was improper to detain appellant based on this factor.

In addition, the evidence of "high crime" which Cozart testified to underscored the inappropriateness of relying on that factor in this case. Cozart testified that 25 to 30 thefts—a "significant" increase—had been reported in the area during the few months preceding appellant's detention. Many incidents involved tools stolen out of pickup trucks. However, none of the thefts Cozart had investigated involved a blue Ford or a yellow pickup. Nor was a Thomas Landrum or "Bub" associated with any of the reported thefts. Also, none of the incidents involved an individual blocking access to a public roadway. In short, as is frequently the problem when a "high crime area" factor is relied upon, Cozart offered no evidence as to "how the allegedly suspicious activity [was] related to the type of activity upon

---

[4]Cozart also testified that his suspicions had been aroused because Landrum lived outside the county and Cozart had never seen him before. Cozart later admitted that that these facts were not inherently suspicious.

which that crime rate estimate [was] based. To the extent such foundational matters are lacking, [this court] cannot logically be expected to accord considerable weight to this factor." (*People* v. *Bower, supra,* 24 Cal.3d at p. 646, fn. 8.)

Moreover, Landrum's behavior did not provide a reasonable basis for suspecting the occupants of the passing truck of criminal activity. Consider Landrum's explanation for his presence—that he had been asked to wait alongside the road because his friend, "Bub," had gone to visit a friend who did not like strangers to know where he lived. That explanation led Cozart to believe that "maybe [Landrum] was just lying to [him]," and was "just suspicious enough to try and find out what [Landrum's] friends were doing." Yet the explanation was not patently inconsistent, false, or inherently implausible. As such, it did not furnish a reasonable basis for suspecting criminal activity. (*People* v. *Sandoval* (1966) 65 Cal.2d 303, 310 [54 Cal.Rptr. 123, 419 P.2d 187]; see *People* v. *Gale* (1973) 9 Cal.3d 788, 802-803 [108 Cal.Rptr. 852, 511 P.2d 1204] [dis. opn. of Mosk, J.].)

Cozart's observation that Landrum stammered and glanced at the ground while conversing with him did not give Cozart cause to stop another's vehicle. ■ Nervousness in the presence of a police officer does not furnish a reasonable basis for a detention, especially where, as here, it "could understandably result from . . . police questioning because of a 'traffic violation.'" (*People* v. *Lawler, supra,* 9 Cal.3d at p. 162, fn. omitted.) As this court has observed, "[t]o hold that police officers should in the proper discharge of their duties detain and question . . . all those who act nervous at the approach of officers would for practical purposes involve an abrogation of the rule requiring substantial circumstances to justify the detention and questioning of persons on the street." (*People* v. *Moore* (1968) 69 Cal.2d 674, 683 [72 Cal.Rptr. 800, 446 P.2d 800]; accord *People* v. *Bower, supra,* 24 Cal.3d at p. 648; cf. *People* v. *Leyba, supra,* 29 Cal.3d at p. 601 [dis. opn. of Mosk, J.].) That reasoning applies with even greater force when an officer uses his suspicions about one individual's nervousness to justify the detention of others.

Nor did Landrum's statement that "Bub" was not the driver of the passing truck furnish a basis for detaining it. ■ As this court has stated in a different context, "'[d]isbelief [of a witness' testimony] does not create affirmative evidence to the contrary of that which is discarded.'" (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 613 [147 Cal.Rptr. 172, 508 P.2d 672], quoting *Estate of Bould* (1955) 135 Cal.App.2d 260, 264 [287 P.2d 8].) In the same vein, Cozart's disbelief of Landrum's denial did not furnish affirmative evidence that "Bub" was in fact the driver of the truck. As Justice Mosk has observed, an individual's explanation "must not be turned against

him on an easy assumption that it is false." (*People* v. *Gale, supra,* 9 Cal.3d at p. 802 [dis. opn. of Mosk, J.].)

Moreover, even assuming the officer reasonably concluded that Landrum may have been lying about who was driving the truck, Cozart had no reasonable grounds for suspecting that its occupants were engaging in criminal activity. All that could be deduced was that the occupants were somehow associated with Landrum, who was not reasonably suspected of anything beyond a vehicle violation. Without some evidence that the pair or the trio were involved in criminal activity, the fact that the truck might have been the vehicle Landrum had described to the officer did not add anything of substance to the *Tony C.* equation.

Another factor Deputy Cozart relied on to justify the detention was that the occupants of the truck looked away when they approached. Cozart testified that their failure to continue looking at him was suspicious because "[m]ost people have a habit of looking at a patrol car when they pass it." However, he admitted that neither man attempted to hide his face or otherwise conceal his identity as the truck passed.

■ This court has held that " '[t]here are many reasons other than guilt . . . why an occupant of an apartment may not wish himself or others present exposed to the immediate view of a stranger, even if the stranger is a police officer.' [Citation.] Even where an individual is out of doors, his 'apparent concern with privacy does not imply guilt.' [Citations.]" (*People* v. *Bower, supra,* 24 Cal.3d at p. 648; cf. *Gallik* v. *Superior Court* (1971) 5 Cal.3d 855, 861 [97 Cal.Rptr. 693, 489 P.2d 573].) That reasoning applies with equal force to drivers and passengers of vehicles who fail to fix their vision on a uniformed officer conducting what appears to be a routine traffic investigation alongside a local highway.[5] A contrary rule would lead to the characterization of most innocent behavior as criminal.

This court has been wary of permitting a police officer to justify a detention by characterizing gestures as criminal. "The difficulty is that from the

---

[5]Ironically, Officer Cozart's formula for appropriate citizen behavior was precisely what officers in another case found suspicious. (See *People* v. *Williams* (1971) 20 Cal.App.3d 590, 592 [97 Cal.Rptr. 815].) The Court of Appeal found such conduct innocuous and held the detention unlawful. In another case, a federal court held that a motorist's failure to look in the direction of a passing police car could not be deemed suspicious conduct. (*United States* v. *Mallides* (9th Cir. 1973) 473 F.2d 859, 861.) While the adage "one man's meat is another man's poison" (Dykes, English Proverbs (1709)) may be appropriate in some contexts, such lack of uniformity in applying the Fourth Amendment cannot be approved. As these cases demonstrate, looking at or failing to look at an officer does not, standing alone, furnish a reasonable basis for a detention. (Cf. *People* v. *Superior Court (Kiefer)*, *supra,* 3 Cal.3d at p. 826, fn. 12.)

viewpoint of the *observer,* an innocent gesture can often be mistaken for a guilty movement. He must not only perceive the gesture accurately, he must also interpret it in accordance with the actor's true intent. But if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be assigned a meaning only in their context. Yet the observer may view that context quite otherwise from the actor: not only is his vantage point different, he may even have approached the scene with a preconceived notion—consciously or subconsciously—of what gestures he expected to see and what he expected them to mean. The potential for mis-understanding in such a situation is obvious." (*People* v. *Superior Court (Kiefer),* *supra,* 3 Cal.3d at p. 818; accord, *People* v. *McGaughran* (1979) 25 Cal.3d 577, 590 [159 Cal.Rptr. 191, 601 P.2d 207].)

The admonition in *Kiefer* is particularly apt in this case. Cozart testified that as the truck passed, the driver looked over at the passenger, who had just turned to look out of the passenger window. Such movements are with-out consequence, especially here, where Cozart admitted that neither oc-cupant ducked, hid his face from the officer's view, or made any other "suspicious" movements. There was no evidence that anything "was being concealed, disposed of, exchanged, or even carried." (*People* v. *Bower,* *supra,* 24 Cal.3d at p. 647.) Cozart's belief that the occupants were at-tempting to conceal their identity "was more an 'inchoate and unparticular-ized suspicion or "hunch'" . . . than a fair inference in the light of his experience . . . ." (*Reid* v. *Georgia, supra,* 448 U.S. at p. 441 [65 L.Ed.2d at p. 894], quoting *Terry* v. *Ohio, supra,* 392 U.S. at p. 27 [20 L.Ed.2d at p. 909].) As such, it did not provide a reasonable basis for a detention.

Another factor Cozart testified to was his belief that the truck accelerated as it passed. He based this on the observation that the truck "appeared to be going away from [him] faster than it came towards [him]." He was unable to offer an estimate of any increase in speed, but acknowledged that the truck approached at a rate of 25 to 30 miles per hour, the speed at which most people travel that road.

As *People* v. *Bower, supra,* 24 Cal.3d 638 makes clear, these facts did not add much. In *Bower,* four or five individuals were walking through a housing project in a "high crime" neighborhood. When they noticed a po-lice car, they stopped, turned around, went back toward an elevator, and " 'formed like a huddle of some sort' . . . ." (*Id.,* at p. 642.) One individ-ual "started moving hurriedly away from the group while looking back over his shoulder toward the police car." (*Ibid.*) When the officers got out of their car and started walking toward the individuals remaining in the group, the group " 'fragmented.' " (*Id.,* at pp. 642-643.) One of the individuals

moved "at a 'very quick walk, almost a run' through a passageway to a nearby street" when he was ordered to stop and turn around. (*Ibid.*)

This court found the detention to be unlawful. The prosecution's argument that the stop was justified, inter alia, by the group's "suspicious behavior" was specifically rejected. (24 Cal.3d at p. 647.) ■ This court noted that an "individual, unless he or she is properly detained and so notified, is as free to avoid [an] officer as to avoid any other person." (*Id.*, at p. 648.) The court further explained that "an outright refusal to cooperate with police officers cannot create adequate grounds for an intrusion which would otherwise be unjustifiable. . . . If the right to be free from unjustified detentions is lost merely by seeking to avoid such encounters, then the right is meaningless; it would exist only to the extent it was not exercised." (*Id.*, at p. 649, see also *id.*, at fn. 9; *Gallik* v. *Superior Court, supra,* 5 Cal.3d at p. 861.)

If the behavior of the group in *Bower* did not warrant a detention, then clearly the behavior of the occupants of the truck here was not a basis on which to justify the stop ordered by Cozart. The occupants of the truck were under no duty to stop. They could legally decide to affirmatively avoid the officer out of a desire to remain uninvolved in Cozart's activities.

Further, neither of the occupants of the truck engaged in "furtive" behavior. As Cozart testified, neither man turned around and looked back in the officer's direction as the truck continued down the road. The pickup did not swerve or drive in a reckless manner at any point.[6] In sum, since the pickup was not driven erratically, and neither occupant's gestures were otherwise objectively suspicious, the fact that the pickup continued on, even at an accelerated pace, was not reasonably indicative of criminal behavior.

### III.

■ In determining the reasonableness of a detention, this court acknowledges that "the totality of the circumstances—the whole picture—must

---

[6]The Court of Appeal decision in *In re Eduardo G.* (1980) 108 Cal.App.3d 745 [166 Cal.Rptr. 873], on which respondent relies, is distinguishable. In that case, officers on patrol entered an alleyway at 3 a.m. and observed a minor driving a car at about five miles per hour. The officers turned their car around and followed the car out of the alley. The car then accelerated out of the alley at 25 to 30 miles per hour, made two "quick turns" and "abruptly stopped at a curb and extinguished the automobile headlights." (*Id.*, at p. 751.) The Court of Appeal found that the accused's "presence in an alley and the behavior of taking extraordinary precautions to avoid the following police vehicle, coupled with the fact that the appellant driver appeared to be a minor, . . . constitute[d] minimum but adequate recognizable and articulable factors to support a temporary stop for investigation." (*Id.*, at pp. 754-755.) Obviously, this case—which involves the appearance of a pickup truck on a local highway, moving at a lawful rate of speed, together with the absence of any objective signs that either occupant was attempting to avoid the officer—is a far cry from *Eduardo G.*

be taken into account. . . . [A]n assessment of the whole picture must yield a particularized suspicion . . . that the particular individual being stopped is engaged in wrongdoing." (*United States* v. *Cortez* (1981) 449 U.S. 411, 417-418 [66 L.Ed.2d 621, 629, 101 S.Ct. 690].)

In making that determination, this court takes into account that the principal function of an officer's investigation is to resolve often ambiguous-appearing circumstances and determine "whether the activity is in fact legal or illegal—to 'enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.'" (*In re Tony C., supra,* 21 Cal.3d at p. 894.) ▮ While an officer's uncertainty as to the nature of suspected criminal activity does not render every detention unlawful (see *People* v. *Leyba, supra,* 29 Cal.3d at p. 599), "no stop or detention is permissible when the circumstances are not reasonably 'consistent with criminal activity' and the investigation is therefore based on mere curiosity, rumor, or hunch." (*In re Tony C., supra,* 21 Cal.3d at p. 894.)

▮ In this case, Officer Cozart's good faith suspicion that the occupants of the truck had engaged in or were about to engage in criminal activity was not reasonable. None of the four factors Cozart testified to satisfied the *Tony C.* test. Nor did they "mysteriously become imbued with an aura of guilt merely by viewing them in their 'totality.'" (*People* v. *Gale, supra,* 9 Cal.3d at p. 806 [dis. opn. of Mosk, J.].) To borrow from Justice Mosk, four "times zero, in [this court's] arithmetic, still equals zero." (*Ibid.*)

Since the detention of the truck was illegal, the items seized pursuant to the subsequent search should have been suppressed.[7]

The judgment is reversed.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**RICHARDSON, J.**—I respectfully dissent.

In my view the record contains ample evidence to sustain the implied findings of *both* the magistrate and the superior court that Officer Cozart had reasonable suspicion to detain defendant.

The pertinent facts and legal principles were correctly described in Justice Elkington's opinion for the Court of Appeal in this case, as follows:

---

[7]In view of the conclusion that appellant's detention was unconstitutional, it is unnecessary to reach the question of whether the consent search exceeded the purpose of the stop.

"Here the illegally parked automobile first observed by the police officers had its taillights covered by cloth, and its occupant explained that he was waiting for someone whose full name he did not know, driving a yellow pick-up truck of Japanese manufacture. When such a vehicle drove by, upon seeing the police officers the occupants looked the other way and speeded up the car. And as stated by [defendant] Loewen's briefs: the police officers' 'suspicions were aroused by: (1) Landrum's nervous behavior; (2) the similarity between the yellow Toyota and Bub's vehicle, as described by Landrum; (3) the behavior of the men in the Toyota as it passed by on the road; and (4) the incidence of thefts in the Anderson Springs-Middletown area.'

"We are unable to conclude . . . that both the magistrate and the superior court acted unreasonably in finding the pick-up automobile's detention to be based upon *more* than 'mere curiosity, rumor, or hunch' (*In re Tony C.* [1978] 21 Cal.3d 888, 894 [148 Cal.Rptr. 366, 582 P.2d 957]), and in recognizing that 'experienced police officers naturally develop an ability to perceive the unusual and suspicious which is of enormous value in the difficult tasks of protecting the security and safety of law-abiding citizens.' (*People* v. *Gale* [1973] 9 Cal.3d 788, 795 [108 Cal.Rptr. 852, 511 P.2d 1204].)"

I would affirm the judgment.