[No. H000181. Sixth Dist. Oct. 31, 1985.]

In re BRIAN A., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
BRIAN A., Defendant and Appellant.

**[Opinion certified for partial publication.‡]**

‡Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III, IV, and V, which do not meet the standards for publication contained in California Rules of Court, rule 976(b).

COUNSEL

Ronald A. Parravano, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Kristofer Jorstad, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**PANELLI, P. J.**—In a petition pursuant to Welfare and Institutions Code section 602, appellant/minor Brian A. was accused of robbery (Pen. Code, § 211), attempted robbery (Pen. Code, §§ 664/211), assault with a deadly weapon (Pen. Code, § 245), and a violation of probation (Welf. & Inst. Code, § 777). The juvenile court found true the allegations of assault with a deadly weapon, attempted robbery, and probation violation and committed the minor to the California Youth Authority.

On appeal, the minor urges reversal on the following grounds: (1) his arrest was without probable cause, mandating suppression of the statements to the police, physical evidence discovered, and the victim's in-court identification; (2) the juvenile court's denial of sanctions for failure to preserve a photographic lineup; (3) the victim's in-court identification was otherwise tainted; (4) the minor's *Miranda*[1] rights were violated; and (5) insufficiency of the evidence. We affirm the determinations of the juvenile court, for the reasons stated below.

*Facts*

Jeffrey Samuels is a taxi driver. On October 1, 1984, he picked up two passengers at approximately 7:30 p.m. at the Quik Stop market in Seaside, and drove them to Dennis The Menace Park. The people the passengers were supposed to meet were not there, and the passengers asked Mr. Samuels to take them to another locale. The passengers then requested Mr. Samuels to return to Dennis The Menace Park, but, before reaching the park, asked Mr. Samuels to stop and let them out by a dumpster.

Mr. Samuels advised the passengers the fare was $6. The passenger in the front seat indicated he had only $5, while the passenger in the rear had 35 cents. Mr. Samuels then asked why one of the passengers, upon entering the cab, asked Mr. Samuels if he had change for a $20 bill. Mr. Samuels

---

[1] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

was told the $20 was in another wallet. Mr. Samuels agreed to accept $5.35 as payment. After further discourse with the passengers, Mr. Samuels was hit from behind three times in rapid succession. After being struck, he shifted the cab into gear and hit the gas, pulling the cab approximately 50 feet from the 2 passengers. The passengers were chasing the cab, and when Mr. Samuels turned it around, they fled.

Mr. Samuels called his dispatcher, who sent the police and other cabs. He described the passenger in the rear seat as a 14- to 16-year-old male, 5 feet 9 inches tall, approximately 135 pounds in weight, wearing blue jeans and a sweatshirt with a shiny red hood. He described the front seat passenger as approximately 5 feet 8 inches in height, of thin build, approximately 125 to 130 pounds, blond hair, wearing blue jeans and a bluish-gray sweatshirt opening down the front. The boys were carrying a black or blue soccer-style bag with double handles. Neither had facial hair.

Two days later, on October 3, 1984, Sgt. Allen Davidson of the Monterey Police Department was off duty in a private vehicle. Sgt. Davidson noticed two boys at a bus stop who he believed matched the description given by Mr. Samuels. Sgt. Davidson had first heard this description broadcast; later he had seen it printed, along with the method of operation of the attack. The description Sgt. Davidson had of the youths was white males, 13 to 15 years old, one wearing a shiny-colored red hooded sweatshirt, the other wearing a light blue sweatshirt, and one carrying a black sports-type duffle bag. Both had Levis on. Sgt. Davidson described the two youths he saw as white males, between the ages of thirteen and fifteen, both wearing Levis, one carrying a black sports-type duffle bag with two handles, one wearing a black bottomed jacket with a nylon red hood and the other wearing a pale lavender sweatshirt with a hood. Both were of medium height and lean build. Sgt. Davidson considered the youths likely suspects and called the police and requested a unit respond to the youths' location. The youths walked to the next bus stop and Sgt. Davidson followed. The youths got on a bus and Sgt. Davidson continued to follow in his car.

Sgt. Davidson observed the youths depart the bus and advised the police communications center of his new position and the direction the youths were walking. At that point he noticed a civilian security guard who Sgt. Davidson knew customarily monitored police department radio cars. He next observed the civilian pull in front of the youths and detain them. Sgt. Davidson conducted a cursory patdown, following which police units arrived. The youths were advised they were to be taken to the police station for questioning regarding a robbery. They were so transported and turned over to Detective Ragghianti.

The youths were separated at the police station. Det. Ragghianti first advised the other youth why they had been brought to the police station. This youth immediately started telling the officer where he had been on that day and what he had done. Det. Ragghianti told the other youth he'd be questioned later and left the interview room to talk to the minor, Brian.

Det. Ragghianti gave the minor the reasons the youths had been brought there and advised him of his constitutional rights pursuant to *Miranda*. He further informed the minor he could have his parent or legal guardian present. The minor indicated that he understood those rights and was willing to waive those rights and talk with the officer. The minor stated that he had been in school that day and afterwards went with the other youth to a third person's residence from approximately 4 or 5 p.m. until later that evening. Det. Ragghianti told the minor he thought he was lying, and when the minor asked if the other youth had made any admissions, Det. Ragghianti told him no but that a little different story had been told. The minor then told the officer that he had called for a cab, got in, eventually pulled the rod out of the bag and struck the driver over the head with it. The driver immediately accelerated away. The minor told the officer that he hit the driver over the head because he wanted money to be able to leave the county area. He told the officer the rod used to strike the driver was located in the other youth's home, either under the bed or the stereo.

The other youth was also advised of his *Miranda* rights and that he could have a parent present. He indicated he would waive his rights and talk with the police, did not want a parent present, and told a similar story to that recounted by the minor. He stated the cab driver was struck over the head with the idea of robbing the cab driver of money.

Det. Ragghianti then went to the other youth's home and contacted the mother, who gave permission and assistance in looking for the weapon. It was found under the stereo stand in the front room.

Prior to the youths' arrests, Mr. Samuels looked at several hundred pictures of youths from mug books and junior high school yearbooks. He could not identify his attackers. The day after the arrest, Mr. Samuels was shown a photo lineup of eight youths, prepared by Detective Ragghianti. It included mug shots of the minor and the other youth, and pictures of six other juveniles which Det. Ragghianti stated were of similar age, race, hair style and color. Mr. Samuels could not make an identification and the photographs of the other 6 youths were returned to the picture file, a box containing 200 to 300 juvenile pictures classified by race and sex. At the time of the hearing, only four of the six other photographs used in the lineup could be found. Mr. Samuels could not make any positive in-court identi-

fication. The prior week, however, he was seen by the two youths in the court hallway. When they noticed Mr. Samuels, the other youth stated: "Oh no," and the minor put his hand over his face.

*Discussion*

I

The minor first contends that a lack of probable cause foɪ arrest requires suppression of his statements to the police, the physical evidence discovered, and the victim's in-court identification. We disagree.

Probable cause for arrest exists "when the facts known to the arresting officer 'would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' (. . . *People* v. *Ingle* (1960) 53 Cal.2d 407, 412 . . . .)" (*People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632].) In denying the minor's motion to suppress, the trial court stated: "I believe the accumulation of items of identification on and between the two individuals gave probable cause for arrest. Considering the elements of height, weight, sex, color, clothes, relationship of clothes to shorter and taller, relationship of height and weight, the black sports bag, all give strong inference value that these were the same individuals, sufficient to constitute probable cause. [¶] . . . When you have identification of one person and you have identification of a second person and then you make an interrelationship between the two, the inference value is progressing in logarithmic quantities. [¶] And so I think the inference value is very, very high, sufficient to constitute probable cause, when you develop that kind of a relationship. So the motion to suppress is denied."

In reviewing the court's denial, all factual conflicts must be resolved in support of the trial court's disposition. "The trial court's factual findings relating to the challenged search or seizure, 'whether express or implied, must be upheld if they are supported by substantial evidence.' (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160. . . .)" (*People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].) However, because the reasonableness of the search is a question of constitutional law, this court is not bound by the substantial evidence standard when reviewing the decision of the lower court. Rather, we must measure the facts, as found by the lower court, against the constitutional standard of reasonableness. In that regard, this court exercises its independent judgment. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People* v. *Loewen, supra,* 35 Cal.3d 117, 123.)

 The description by Sgt. Davidson when he noticed the youths corresponded with the description given by Mr. Samuels and broadcast by the police. The descriptions significantly matched as to age, height, weight, sex, race, and the bag being carried. Although the number of points of comparison is not necessarily dispositive, here, it is quite high. Uniqueness of the points of comparison must also be considered in testing whether the description would be inapplicable to a great many others. Here, only the "shiny red hood" is fairly unique. However, in the factual context of this case, we need not determine whether probable cause would have existed for the arrest of either youth had they not been together.

The officer was aware the crime had been committed by two youths. The officer's description of both minors matched that given by the victim. Where, as here, there were two perpetrators and an officer stops two suspects who match the descriptions he has been given, there is much greater basis to find sufficient probable cause for arrest. The probability of there being other groups of persons with the same combination of physical characteristics, clothing, and trappings is very slight.

After reviewing all of the circumstances, we find probable cause supports the minor's arrest. Accordingly, the denial of his motion to suppress his statements, the weapon, and Mr. Samuels' alleged in-court identification, was proper.

II-V*

. . . . . . . . . . . . . . . . . . . . . .

*Conclusion*

The judgment is affirmed.

Agliano, J., and Brauer, J., concurred.

*See footnote, *ante,* page 1168.