Filed 2/18/20 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BLANCA LUNA MENDOZA,<br><br>    Defendant and Appellant. | E071835<br><br>(Super.Ct.No. SWF1707770)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

We deny the People's petition for rehearing and modify the opinion filed in this matter on February 5, 2020, by adding the following language to the opinion as footnote 5, appended to the end of the last sentence of the first partial paragraph on page 17, after "innocuous."

> At oral argument and in a motion for rehearing, the People argue our conclusion that Mendoza's conduct wasn't sufficient to arouse reasonable suspicion even assuming she knew the person observing her was law enforcement was nonbinding dicta. We disagree. "It is well settled that where two independent reasons are given for a decision, neither one is to be considered mere *dictum*, since there is no more reason for calling one ground the real basis of the decision than the other. The ruling on both grounds is the judgment of the court and each is of equal validity." (*Bank of Italy etc. Assn. v. Bentley* (1933) 217 Cal. 644, 650; see also *Woods v.*

1

*Interstate Realty Co.* (1949) 337 U.S. 535, 537 ["[W]here a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*"]; *Greyhound Lines, Inc. v. County of Santa Clara* (1986) 187 Cal.App.3d 480, 485 ["When an appellate court bases its decision on alternative grounds, none is dictum"]; see generally 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 512, pp. 577-578.)


CERTIFIED FOR PUBLICATION


SLOUGH
Acting P. J.


We concur:


FIELDS
J.


MENETREZ
J.

Filed 2/5/20 (unmodified version)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E071835 |
| v. | (Super.Ct.No. SWF1707770) |
| BLANCA LUNA MENDOZA, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. John M. Davis, Judge. Reversed.

Randall Conner, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Blanca Luna Mendoza of transporting for sale more than four kilograms of cocaine based on evidence a U.S. Customs and Border Protection agent acquired after a stop on Interstate 15. Mendoza sought to exclude the evidence, arguing the agent did not have reasonable suspicion she was engaged in criminal activity when he stopped her.

The agent said he decided to stop Mendoza because she was driving in a known smuggling corridor in a vehicle which had crossed the United States-Mexico border in the prior week; she slowed and changed lanes after he pulled alongside her in an unmarked car, rolled down his window, and stared at her; she drove at approximately 50 miles per hour to stay behind him; and she then refused to look at him when she ultimately passed him a few minutes later. The trial court held—albeit with reservations—that the stop was justified, and a jury later convicted her of transporting narcotics for sale. Mendoza appeals her conviction based only on the impropriety of the stop.

We conclude the agent based his decision to stop Mendoza on insufficient evidence she was engaged in criminal activity. At bottom, the agent acted on a hunch, which is improper, even though—in this case—it proved correct. We therefore reverse the conviction and remand for further proceedings.[1]

---

[1] Our reversal makes it unnecessary to reach Mendoza's challenges to her sentence.

# I

# FACTS

A. *The Decision to Stop Mendoza*

United States Border Patrol Agent Arturo Acosta testified for the prosecution at a hearing on Mendoza's motion to suppress.

He began by describing his experience and training. When he testified, Agent Acosta had been a border patrol agent for almost 10 years and a member of the High Intensity Drug Trafficking Area task force for less than a year. With the task force, his responsibilities included patrolling, observing traffic, looking for illicit activity on the highways, and running records checks.

Agent Acosta said his training included behavior analysis, which he described as "being able to—for us to be able to pull over a vehicle, we need reasonable suspicion. For me, a reasonable suspicion is a hunch of articulable facts that will allow us to pull over a vehicle. [¶] The explanation could be something simple, something simple as a lane change, the behavior or the person in the vehicle, the vehicle slowing down."

On the morning of November 8, 2017, Agent Acosta was patrolling in an unmarked car on Interstate 15 in San Diego County near the southern border of Riverside County. Agent Acosta said he was there as part of the drug interdiction task force, and the area he was patrolling is a major corridor for trafficking narcotics from Mexico.

At approximately 9:45 a.m., Agent Acosta saw Mendoza's blue Jeep Liberty traveling on I-15 near Highway 76. Consistent with his usual practice, he said, he ran her

plates and learned the vehicle had crossed the U.S.-Mexico border within the last week. "It was—what I do on [the] highway, I run vehicle plates, and I try to get any nexus to the border. So, I run plates and look at them. And this vehicle had recent nexus to the border when I saw it." Agent Acosta also learned the car was registered to a woman who resided in Chula Vista, near the U.S.-Mexico border. On cross-examination, Agent Acosta said he obtained no other information about the car or the driver at that time and acknowledged there was nothing else about the vehicle that drew his attention.

Based on the recent border crossing, Agent Acosta approached Mendoza and her vehicle. "So, the initial thing that I did, I saw that it had a nexus [to the U.S.-Mexico border]. I pulled up next to the vehicle to see who was driving the vehicle, see if it was a female, male, then determine if it's the same person that was in the vehicle just by gender. And when I did that, I couldn't see her. [¶] So, I rolled down my window, I looked over at her, and she looked over at me." He said he believed he pulled alongside Mendoza on her passenger side and the two made eye contact after he rolled down his driver-side window. He said they maintained eye contact for a while because he remembered "leaning forward in the vehicle to get a better look when I think she got a really good look at me."

According to Agent Acosta, Mendoza's reaction was cause for suspicion. He said, after "I introduced myself by rolling down the window, having her see [me], [and] me I see[] her" he was able to judge her reaction against how the general public drives. Whereas the public "don't seem nervous they don't seem to be erratic in lane changing,

4

slowing down," Mendoza, "immediately slowed down in speed and then got behind me." According to Agent Acosta, he moved his vehicle into the slow lane, to the right of her, but Mendoza "was not willing to pass me even though I slowed down to approximately 50 miles an hour." They drove like that—Agent Acosta ahead of Mendoza and one lane to her right—for about three miles. At that point, Mendoza passed Agent Acosta's car on the left. He said she had both hands on the wheel and didn't look at him as she passed.

Agent Acosta decided to initiate a traffic stop and activated his patrol vehicle's lights and siren once he was behind her. He described the totality of the circumstances warranting the stop like this: "So, the totality is based off of the nexus to the border—recent nexus to the border, female crossing it, female driver of the vehicle, driving behavior, lane changes behind me, speed, not passing me for—I believe it was approximately three miles even though I slowed down considerably because—in comparison to the general public that was on the highway that day, her rigid posture once I approached the vehicle again. All of that and I thought I had a reasonable suspicion to pull over the vehicle."

Once Mendoza had stopped, Agent Acosta approached the vehicle, identified himself as a border patrol agent, and began conducting a roadside interview in Spanish. During the interview, Agent Acosta noticed a black backpack on the passenger-side backseat of the car. He asked Mendoza for permission to search the vehicle and she consented. Inside the backpack, he found seven packaged bricks of cocaine, each weighing approximately one kilogram.

B. *The Court Proceedings*

The Riverside County District Attorney charged Mendoza with transporting a controlled substance for sale (Health & Saf. Code, § 11352, subd. (a); count 1) and possessing a controlled substance for sale (Health & Saf. Code, § 11351; count 2). On both counts, they alleged Mendoza possessed more than four kilograms of cocaine. (Health & Saf. Code, § 11370.4, subd. (a)(2).) On the People's request, the court dismissed count 2 and the corresponding enhancement allegation before trial.

Mendoza moved to suppress the drug evidence on the same ground she asserts here on appeal—that the agent didn't have reasonable suspicion to justify the stop. Defense counsel argued the agent simply jumped to unwarranted conclusions and had no basis reasonably to infer Mendoza was engaged in criminal activity. The prosecution argued the totality of the circumstances provided the agent with reasonable suspicion Mendoza was engaged in criminal activity.

The trial court heard Agent Acosta's testimony and noted how weak the justification was for making the stop. "I agree with pretty much everything the defense has said about the—about how weak it is [¶] . . . [¶] I agree, though, with the defense that this is really, really lightweight."

Nevertheless, the court denied the motion to suppress. "I don't disagree with the defense that this is like the bottom of allowability for reasonable suspicion. I mean, it's just—there's a couple things there. But under the case law, they were articulable by the officer. [¶] Here's the four things that are, whatever, five things, that I used because I

6

thought that . . . made this person suspicious. And that's what they do on the freeway. And also, all he did was stop her to talk to her for a little bit. [¶] . . . I'm going to deny the motion, but I do agree that if this was taken up on appeal or whatever, that this is paper thin for reasonable suspicion. It certainly was in the officer's mind, and he's an experienced officer. [¶] And he was able to articulate four or five things. They were weak, but they were together in the totality. They were articulable reasonable suspicions. They weren't something he made up. And they weren't something that had nothing to do with anything. And so I'm going to deny the motion with the understanding that this is like the very bottom of what I would actually [¶] . . . approve. I think it's pretty weak."

The drug evidence admitted, a jury found Mendoza guilty of transportation of narcotics for sale and found true the quantity enhancement allegation. At sentencing, the trial court imposed the low term of three years for the offense and five years consecutive for the enhancement. The court imposed a split sentence of eight years in county custody, divided between four years in county jail and four years of mandatory supervision.

Mendoza filed a timely notice of appeal.

## II

## ANALYSIS

Mendoza argues the trial court erred by denying her motion to suppress the evidence found during the search of her vehicle because law enforcement did not have reasonable grounds to stop her in the first place. Since the stop was unlawful, she argues,

the trial court should have suppressed the fruits of the search conducted after the stop. (*People v. Loewen* (1983) 35 Cal.3d 117, 122-123 (*Loewen*).) We agree.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. (*Terry v. Ohio* (1968) 392 U.S. 1, 8-9.) The primary purpose of the Fourth Amendment is to "impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order to 'safeguard the privacy and security of individuals against arbitrary invasions.'" (*Delaware v. Prouse* (1979) 440 U.S. 648, 653-654.) "A defendant may move . . . to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure" if "[t]he search or seizure without a warrant was unreasonable." (Pen. Code, § 1538.5, subd. (a)(1)(A).) A traffic stop is a seizure within the meaning of the Fourth Amendment. (*Delaware v. Prouse*, at p. 653.)

"It is settled that circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation." (*In re Tony C.* (1978) 21 Cal.3d 888, 892, superseded on another ground as stated in *People v. Lloyd* (1992) 4 Cal.App.4th 724, 733.) However, law enforcement officers are not free to detain citizens at will. "[T]o justify an investigative stop or detention the circumstances known or apparent to the officer must include specific or articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity." (*In re Tony C.*, at p. 893.)

8

Officers may properly "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" (*United States v. Arvizu* (2002) 534 U.S. 266, 273 (*Arvizu*).) However, the officer's suspicion must be objectively reasonable. "[T]he facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on [their] training and experience . . . to suspect the same criminal activity and the same involvement by the person in question. The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch, is unlawful, even though the officer may be acting in complete good faith." (*In re James D.* (1987) 43 Cal.3d 903, 919-920.)

We exercise independent judgment to determine the legality of the search or seizure, but we defer to the trial court's factual findings supported by substantial evidence. (*People v. Suff* (2014) 58 Cal.4th 1013, 1053; *People v. Ayala* (2000) 23 Cal.4th 225, 255.) We resolve factual conflicts in the manner most favorable to the trial court's disposition of the suppression motion. (*People v. Martin* (1973) 9 Cal.3d 687, 692.)

Here, it was not objectively reasonable to suspect Mendoza was involved in criminal activity. Agent Acosta said Mendoza caught his attention initially only because she was driving in a known drug trafficking corridor in a vehicle that had crossed the U.S.-Mexico border approximately a week earlier.

9

There's no question driving on the I-15 is not sufficient to warrant a stop. Interstate 15 is a heavily traveled stretch of highway. The portion of the I-15 in San Diego County is among the top 20 most traveled highway stretches in the United States, averaging 295,000 vehicles a day in 2008. (Office of Highway Policy Information, U.S. Dept. of Transportation, Most Travelled Urban Highways Average Annual Daily Traffic, https://www.fhwa.dot.gov/policyinformation/tables/02.cfm, as of Jan. 7, 2020.) According to the California Department of Transportation, in 2017 the average daily traffic on northbound I-15 between the Highway 76 intersection and the Mission Road intersection exceeded 146,000 vehicles. (California Department of Transportation, Caltrans Traffic Census Program, https://dot.ca.gov/programs/traffic-operations/census, as of Jan. 7, 2020.)[2] "An 'officer's assertion that the location lay in a 'high crime' area does not elevate . . . facts into a reasonable suspicion of criminality . . . The spectrum of legitimate human behavior occurs every day in so-called high crime areas.'" (*Loewen*, *supra*, 35 Cal.3d at p. 124.)

Nor does Mendoza's "nexus" to the border warrant a stop. The U.S.-Mexico border is the most crossed border in the world. (Glenday, Craig (2009) *Guinness World Records 2009*, Random House Digital, Inc. p. 457 ["in 2000, more than 290 million people crossed from Mexico into the USA"].) According to the United States Department

---

**2** We grant Mendoza's motion for judicial notice as it concerns statistics regarding the volume of border crossings and daily traffic as reported by the U.S. Department of Transportation and the California Department of Transportation. (Evid. Code, §§ 452, subd. (h), 459, subd. (a).) In all other respects, we deny the motion.

10

of Transportation, Bureau of Transportation Statistics, 1,158,239 personal vehicles entered the United States from Mexico through the San Ysidro port of entry in November 2017. (Bureau of Transportation Statistics, U.S. Dept. of Transportation, Border Crossing Entry Data, https://www.bts.gov/content/border-crossingentry-data, as of Jan. 7, 2020.) Thus, though Mendoza's vehicle's recent border crossing and location on the I-15 provided some reason to look into her activities further, they provided almost no basis for thinking she was involved in criminal activity. Those factors alone would draw into suspicion tens of thousands of people every day, perhaps more. The factors law enforcement rely on to justify a stop, if amenable to innocent explanation, "must serve to eliminate a substantial portion of innocent travelers." (*United States v. Foreman* (4th Cir. 2004) 369 F.3d 776, 781; see also *People v. Valenzuela* (1994) 28 Cal.App.4th 817, 834 [no reasonable suspicion where "[t]he criteria upon which [the agent] relied did not differentiate defendant from any number of innocent persons"].) Agent Acosta therefore needed some other basis for stopping Mendoza.

The additional factors Agent Acosta described were simply insufficient to warrant the stop. The agent said he also considered the fact that Mendoza slowed and moved over behind him after he pulled alongside to inspect her vehicle. However, the manner of his approach is critical to evaluating Mendoza's reaction. He acknowledged he drove an unmarked vehicle with no signs of its relation to law enforcement. As a result, when he pulled alongside her it was his conduct that looked suspicious, not hers. The agent said he drew even on her passenger side, couldn't see her through his tinted windows, lowered

11

his window, and then stared at her. Indeed, he said he bent forward to get a better look and their eyes met. She reacted by taking fairly innocuous action to avoid him. Mendoza didn't drive erratically, didn't changed lanes repeatedly, and didn't use other evasive maneuvers. She just slowed down and pulled behind him.[3]

Given the fact that Agent Acosta drove an unmarked vehicle and did nothing to identify himself as law enforcement, the most natural interpretation of Mendoza's conduct is that she sought to avoid him because she found his conduct threatening and potentially aggressive. Agent Acosta did not appear to make this connection but instead inferred she was trying to avoid him to cover up her criminal conduct.

Mendoza's conduct after getting behind the agent adds no basis for suspicion. The agent said he slowed down and then changed lanes to be on Mendoza's right. He expected she would pass him at that point, but she instead slowed with him and drove at approximately 50 miles per hour in the second lane from the right to keep him in front of her. Agent Acosta inferred she was trying to avoid being stopped by law enforcement. But given the absence of evidence that she knew it was law enforcement who was inspecting her, the natural inference is she was trying to maintain a safe position with respect to a civilian driver who was behaving in a threatening manner toward a woman driving alone.

---

[3] The People rely on *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 147-148, as support for the proposition that Mendoza's slowing down to fall behind Agent Acosta provided a basis for him to infer she was attempting to avoid contact with law enforcement. Among other distinguishing features of that case, the officer in *Letner and Tobin* followed the defendant in a *marked* patrol car. (*Id*. at p. 147.)

When Mendoza finally passed his vehicle, he said she kept both hands on the wheel and looked straight ahead. Her posture and comportment is consistent with any number of innocent explanations, for example she felt threatened by the fact that a stranger had pulled alongside her vehicle, rolled down his window, and stared at her. In any event, it was perfectly natural for Mendoza to keep her hands on the steering wheel and her eyes on the road, as Agent Acosta testified she did. (*People v. Moore* (1968) 69 Cal.2d 674, 683 (*Moore*), overruled on another ground by *People v. Thomas* (1977) 19 Cal.3d 630, 637; *People v. Valenzuela*, *supra*, 28 Cal.App.4th at p. 828 ["[T]he inference that 'nervousness' existed and was based on defendant's desire to avoid contact with Agent Hudson is pure speculation"].) Again, the reasons Agent Acosta articulated for suspecting Mendoza of criminal conduct are insufficient.

We don't mean to suggest the reactions of a person under observation by law enforcement can't warrant a stop. They may, under the right circumstances. But for such a reaction to evince guilt, rather than general fear or caution, there must be some indication the person is aware they're being observed by law enforcement. That element is absent here and sets this case apart from a case like *Arvizu*, where the defendant engaged in much more suspicious conduct on seeing a recognizable border patrol vehicle approach. (*Arvizu*, *supra*, 534 U.S. at pp. 270-271.)

The defendant in *Arvizu* also put out many more signals to warrant suspicion. First, the circumstances themselves were much more suspicious. The defendant was driving "along a little-traveled route used by smugglers to avoid [a border patrol]

13

checkpoint," the agent knew the driver was passing through when officers would be leaving their backroads patrols to change shifts, and it was unlikely the driver and his family were on an innocent picnic outing because they had already turned away from known recreational areas in one direction and reaching those in another direction would have required a 40-to-50-mile trip on unpaved and primitive roads. (*Arvizu*, *supra*, 534 U.S. at pp. 268, 270, 277.) Second, the conduct of the people in the car, who knew border patrol was watching them, was much more unusual than Mendoza's mild attempt to keep her distance from Agent Acosta. The agent noticed children in the back of the vehicle had their knees up "unusually high, as if their feet were propped up on some cargo on the floor," and said the children "put their hands up at the same time and began to wave at [the agent] in an abnormal pattern . . . as if the children were being instructed," a gesture which continued for a period of four or five minutes. (*Id.* at p. 270.) The setting, the evidence that the people knew they were being observed by law enforcement, and their unusual conduct gave the agent in that case a strong basis to suspect they were engaged in criminality. Here, the agent stopped Mendoza while she drove on a major highway displaying nothing but ordinary nervousness after being accosted by an unfamiliar man whose connection with law enforcement was not evident.

Of course, we must consider all the factors Agent Acosta identified together. (*U.S. v. Valdes-Vega* (2013) 738 F.3d 1074, 1078-1079.) But the factors he articulated were not sufficient even in their totality, and even accepting that Mendoza's slow speed, lane change, and rigid posture indicated signs of nervousness under scrutiny. We therefore

14

conclude the agent essentially operated on a hunch, not reasonable suspicion.[4] (*Loewen*, *supra*, 35 Cal.3d at pp. 128-129 ["[S]ince the pickup was not driven erratically, and neither occupant's gestures were otherwise objectively suspicious, the fact that the pickup continued on, even at an accelerated pace, was not reasonably indicative of criminal behavior"].) Indeed, that's how Agent Acosta articulated his own understanding based on his "behavior analysis" training: "For me, a reasonable suspicion is *a hunch of articulable facts*." Respectfully, a hunch is not enough, and the totality of evidence supporting reasonable suspicion must be something more than the fact that a driver in a known crime area executed a lane change, slowed down, and refused to acknowledge the scrutiny of a law enforcement officer who was not identified as such.

Our Supreme Court's opinion in *People v. Moore* supports our conclusion. There, a police officer observed a man making a telephone call from a public phone booth in an area of high narcotics traffic. (*Moore*, *supra*, 69 Cal.2d at pp. 677-678.) The man seemed to see the officer and then "moved from a comfortable position in the telephone booth, and turned his back on the police car. Defendant appeared nervous. The officer thought

---

[4] The People rely on *United States v. Raygoza-Garcia* (9th Cir. 2018) 902 F.3d 994, 1000-1001 and *U.S. v. Cheromiah* (10th Cir. 2006) 455 F.3d 1216, 1218-1219 to support the reasonableness of Agent Acosta's suspicion, but the defendants in those cases exhibited many more signs they were engaged in criminal conduct. In *Raygoza-Garcia*, the agents determined the vehicle had recently crossed the border multiple times, crossed again the same morning, and a different person was driving the vehicle. In *Cheromiah*, the vehicle had temporary license plates, drove on a "well-known circuitous route frequently used by smugglers to avoid the Border Patrol checkpoints," and the agents observed someone in the back of the van "diving down" when law enforcement came into view.

that defendant 'was trying to avoid' him." Considering his nervous conduct together with "'the area and the surrounding circumstances,'" the officer detained the man. (*Ibid*.) Our Supreme Court held the detention was invalid. The Court held "[t]o hold that police officers should in the proper discharge of their duties detain and question all persons in that location or all those who act nervous at the approach of officers would for practical purposes involve an abrogation of the rule requiring substantial circumstances to justify the detention and questioning of persons on the street." (*Id*. at p. 683.) We conclude the same logic applies here.

Indeed, the *Moore* case would require the same result even if Agent Acosta had approached Mendoza in a marked border patrol vehicle. First, the setting here was far less suspicious than in *Moore*, where the police officer saw the suspect in an area where "[t]he officer had made several narcotics arrests" and he knew "addicts [went] to th[e] location to make purchases from the street peddlers." (*Moore*, *supra*, 69 Cal.2d at p. 678.) As we've noted, though the I-15 is a known drug trafficking corridor, it also accommodates far more traffic for legitimate business and personal travel. Driving on the highway—even within a week of driving across the border—is far less reason for suspicion than loitering in an area known as a locus for street drug sales. Second, Mendoza's reaction to the officer's presence was as innocuous as the reaction of the defendant in *Moore*. There, the officer said the defendant saw the police car enter the parking lot and changed positions in a telephone booth, from a comfortable position to a more awkward position seemingly to avoid the police. (*Ibid.*) Mendoza did nothing more than attempt to avoid

16

Agent Acosta here. She saw someone pull alongside her, lower his window, and try to make eye contact. She reacted by slowing to get behind the other driver and slowing more when the other car slowed with her. She then took a few minutes before deciding to pass him and refused to look over as she passed. This demonstrates nothing more than nervousness under observation and does not warrant a stop, particularly when the other circumstances were so innocuous. (*Id.* at p. 683.)

We therefore agree with the trial court that the justification for the stop was "paper thin for reasonable suspicion." We disagree, however, with the court's conclusion that the agent's articulated reasons were enough to paper over the problems with the decision to stop Mendoza's vehicle. It's not enough that the agent "was able to articulate four or five things" to justify the stop, or that those things "weren't something he made up . . . [or] weren't something that had nothing to do with anything." The Fourth Amendment requires more.

To initiate a stop, an agent must have an objectively reasonable basis for suspicion. The agent in this case did not have such a basis. Nothing about Mendoza's car suggested she might be involved in criminal activity, and though she sought to avoid the agent, the evidence doesn't suggest she knew he was law enforcement. That fact undercuts the agent's inference that she was trying to avoid detection of criminal conduct, but given the setting, Mendoza's reaction to being observed was so minor it wouldn't provide adequate ground for suspicion even had the agent been driving a marked law enforcement vehicle. We therefore conclude the agent acted without a reasonable basis

for suspicion when he stopped Mendoza, and the trial court erred in denying her motion to suppress.

We recognize the trial court credited Agent Acosta's testimony and we do not mean to suggest he did not testify in good faith. However, in this case, Agent Acosta's "good faith suspicion" Mendoza was "engage[d] in criminal activity was not reasonable. None of the . . . factors [he] testified to . . . 'mysteriously bec[a]me imbued with an aura of guilt merely by viewing them in their 'totality.''" (*Loewen*, *supra*, 35 Cal.3d at p. 129.) Any amount times zero equals zero. (*Ibid.*)

## III

## DISPOSITION

We reverse the judgment.

CERTIFIED FOR PUBLICATION

SLOUGH
Acting P. J.

We concur:


FIELDS
        J.


MENETREZ
        J.