[No. E010723. Fourth Dist., Div. Two. Nov. 30, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
ANGELO G. VALENCIA, Defendant and Appellant.

## Counsel

Reginald E. Alberts and Alfredo Flores for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley, Robert M. Foster and Demetra P. Lewis, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**RAMIREZ, P. J.**—Angelo Valencia pleaded nolo contendere to transporting cocaine (Health & Saf. Code, § 11352, subd. (a)) and was sentenced to prison. He appeals, contending his motion to suppress (Pen. Code, § 1538.5) was erroneously denied. We reject his contentions and affirm.

### Facts

Officer Gray of the California Highway Patrol (CHP) testified that around 8:40 a.m. on January 24, 1991, he spotted Valencia, Valencia's brother and Ysidro Nunez under a canopy at a gas station in Needles. The three men got into Valencia's Bronco and went across the street to a market. As the Bronco accelerated across the street, and from a distance of 20 to 25 feet[1], Gray heard what he termed "loud exhaust" coming from the vehicle. He then saw the men go into a market and come back outside, get into the Bronco and onto I-40 going west. Gray denied that he was surveilling the men.

Gray, who had the windows of his cruiser rolled down, followed the Bronco on the freeway and pulled up beside it to make sure that the exhaust was loud. Having satisfied himself that it was, and that this constituted a violation of Vehicle Code section 27150, he activated his red lights, just after the Bronco passed the exit for Laughlin, Nevada. The Bronco pulled to the side and Gray parked behind it.

Gray approached the driver, Valencia's brother, and asked him for his driver's license and the vehicle's registration. The brother said he did not

---

[1] Gray testified that he was facing the front passenger side of the Bronco.

have his license. Valencia handed Gray the registration,[2] which listed the owner as a Michael Rodriguez. Gray testified at the hearing that, at this point, he began to suspect that the Bronco was stolen. Gray also noticed that there was only one duffel bag in the vehicle.[3]

Gray asked Valencia if the Bronco belonged to him, and the latter said yes. Gray inquired of Valencia if he had the bill of sale, as Gray had been told that the car had been recently purchased. Valencia replied that he did not.

Gray had Valencia's brother step out of the Bronco and to the front of his cruiser. In response to Gray's questions, the brother said that Valencia was the owner of the car and that, at one time, he had a driver's license. Gray contacted the Barstow Police Department to run a warrant check and a driver's license check on the brother. He also wanted to run a check on the Bronco, but that system was down. While the check proceeded, Gray began writing Valencia's brother a citation.[4] This occurred within two minutes of the initial stop.

In response to more questions by Gray, Valencia's brother stated that he was coming from Los Angeles and was on his way to Laughlin, where he planned to stay one-half day. He said he did not intend to go anywhere else.

Barstow dispatch reported back to Gray that it still did not have the results of the search for the brother's driver's license.[5] Gray asked the brother the names of the passengers in the Bronco and the latter supplied them. Gray put the brother at the front of the Bronco. According to Gray, the brother was

---

[2]Gray testified that he was unable to recall if Valencia also handed him his driver's license at this time, although he acknowledged that Valencia did, at some point.

[3]During the subsequent search of the car, three other nylon bags, one fishing pole, two tackle boxes and one cassette case were found. However, Gray insisted that he had not seen these items in the car before the search.

[4]The citation was not completed until later. It was never given to Valencia's brother, but, instead, was used only for statistical purposes. On the citation, Gray listed violations of the laws requiring a driver to wear seat belts and have an operator's license and three violations of the Health and Safety Code—the latter for possessing and transporting cocaine and for possessing it for sale. Gray testified that he ran out of room on the citation to list the loud-exhaust offense, and this did not matter anyway, since the citation was used only for statistical purposes.

[5]At the hearing, Gray stated his awareness that under Vehicle Code section 40302 he was authorized to detain Valencia's brother until he ascertained his identity. He was correct. (See *People* v. *Valdez* (1966) 239 Cal.App.2d 459 [48 Cal.Rptr. 840], disapproved on other grounds in *People* v. *Doherty* (1967) 67 Cal.2d 9, 15 [59 Cal.Rptr. 857, 429 P.2d 177].)

not free to leave. At that point, an off-duty officer in street attire arrived at the scene.[6]

Gray removed Valencia from the Bronco and brought him to the front of his cruiser. In response to Gray's questions, Valencia said that he was the owner of the Bronco but he did not have the bill of sale for it, he was coming from Los Angeles and was going to Rosewell, New Mexico, and, possibly, to Laughlin thereafter. Gray asked Valencia if he knew he was going in the wrong direction to be headed toward New Mexico. Valencia replied that his brother got nervous when he saw Gray following them, and he went the wrong way on I-40. Gray asked Valencia why they were going to New Mexico and he responded that Nunez had had a falling out with his mother, who lives there, and they were taking him there so he could patch things up with her. In response to Gray's questions, he said that they planned to spend three days in New Mexico and did not intend to go anyplace else. He also said that he had known Nunez for eight years.

Gray then placed Valencia at the front of the Bronco, telling him not to move and not to converse with his brother. Due to the conflicts between the answers Valencia and his brother gave, Gray took Nunez from the Bronco, placed him at the front of his cruiser and questioned him. Gray testified at the hearing that the conflicts in the stories caused him to suspect that the three men were trafficking drugs. He stated that factors he had already taken note of and others which later came to his attention fit within the drug courier profile he had learned about through his training and experience.

Answering Gray's questions, Nunez said that they were coming from the Los Angeles area and were headed for Rosewell, New Mexico, because his mother, who lived there, was sick. He said he was unsure how long they planned to stay there, but it may be two days. He said Valencia owned the Bronco and he had known Valencia for four years. Gray put Nunez at the front of the Bronco with Valencia and his brother. Fifteen minutes had passed since the stop occurred. At some point, Gray had seen a blanket in the Bronco and Nunez had given Gray his driver's license.

In order to clear up the conflicts between the answers given by Nunez and Valencia, Gray again asked Valencia why they were going to New Mexico.

---

[6]There is some conflict in the evidence presented at the hearing on this point. Gray testified as indicated, however, the off-duty officer testified that he identified himself to the victim's brother and showed him his badge, then, along with Gray, talked to him before Valencia was interviewed. The off-duty officer's wife (see fn. 7, *post*), who observed from their truck, testified that first Gray and her husband talked to Valencia's brother, then to Valencia, then both talked again to Valencia's brother before removing Nunez from the Bronco to interview him.

Valencia reiterated that it was because of the falling out between Nunez and his mother.

Gray asked Valencia for consent to search the Bronco and its contents. Valencia looked at Gray for five to ten seconds and did not answer him. Gray asked the question again. Valencia told Gray there was a gun in the Bronco. Gray thanked Valencia for being honest with him. Gray got a CHP consent form and asked Valencia, for the third time, if he could search the Bronco. Valencia said yes. The time was then 9:20 a.m. Gray filled out the form, explained it to Valencia and asked Valencia to sign it, which the latter did.

Gray then asked Valencia's brother and Nunez if he could search the Bronco and its contents. Both said yes. Gray explained the consent form to both men and they signed it. Gray retrieved from the Bronco the bag, which Valencia had told him contained a gun. Inside, he found a loaded semiautomatic pistol.

A search of the Bronco uncovered a cellular phone, a beeper, and what Gray suspected were pay-owe sheets. A police-trained dog, under the care of the off-duty officer,[7] sniffed around the Bronco and alerted at the left rear-quarter panel. Gray went inside and saw that some of the screws holding the interior of the panel in place were missing. He removed the remaining screws and found cocaine inside. He then arrested all three men for transporting the drug and "Mirandized" them. Valencia was Mirandized at 10:40 a.m., his brother at 10:42 a.m. and Nunez at 10:44 a.m..

The off-duty officer, called by the defense, testified at the hearing that he kept his .22-caliber semiautomatic, which was his gun for personal use, in his back pocket while he was at the scene of the stop. He denied drawing the weapon at any point. He testified that he was with Gray when the latter questioned all three men and obtained their consent. He stated that less than 15 minutes elapsed between his arrival at the scene and the giving of consent to search the Bronco. He said that three to four minutes passed between the time that Gray asked Valencia to consent to the search and when Valencia signed the consent. He also said that both Valencias verbally consented within seconds of being asked. He stated that a third officer arrived and watched the three men as he and Gray searched the Bronco.

The trial court had the Bronco brought to the courthouse parking lot, where the engine was run at a high or fast idle. The court had the bailiff

[7] The off-duty officer arrived at the scene in his privately owned truck. His wife was with him. They had been on their way to breakfast in Laughlin. After he and Gray searched the Bronco for three to five minutes, he asked his wife to drive back to their house and retrieve the dog. His wife went home, got the dog, and brought it back.

bring the accelerator down to half throttle. With the prosecutor's help, Gray testified that when he first came out into the courthouse parking lot and one of the defense attorneys "mashed the accelerator," the Bronco made the same noise he had heard on January 24.[8] The court directed that the same thing be done to the Bronco again and Gray testified that the noise which was produced was the same noise he had heard earlier—except that it had been louder. He said that when he heard the Bronco on January 24, it sounded a "bit louder" than it had when the court conducted the experiment. He testified that based on his previous work on cars, he had concluded that "the manifold exhaust [was] loose." Defense counsel had Gray take the court and counsel 20 feet, then 25 feet from the Bronco to listen to the noise it was producing.

After the experiment, Valencia moved to dismiss on the ground that it was "self-evident . . . that [the Bronco] was not loud." The trial court announced the following factual findings: "The court [h]as heard the vehicle operating in the parking lot at . . . wh[at] is probably best described . . . as a fast idle, and at the half throttle position . . . . [¶] . . . [T]he court was standing within ten feet of the vehicle at all times . . . . The vehicle operated noisily at first and quieted substantially after about five minutes . . . . The vehicle's sound was sufficiently quiet to allow conversation at the site of the vehicle during the time that we were out there. It was not loud during the taking of testimony. And loud in the sense of being raucous or as if the muffler were disconnected from other portions of the car. [¶] Within the meaning of [Vehicle Code section] 27150(a)[,] the muffler which was heard here . . . was not 'loud,' but it was *not 'adequate'* either. [¶] The Vehicle Code says that every motor vehicle . . . shall, at all times, be equipped with an adequate muffler in constant operation and properly maintained to prevent any excessive or unusual noise. . . . [¶] . . . [T]he muffler was *not 'adequate'* in the sense that it was *louder than a properly operating new or newer vehicle.* And this one had what I would think to be *an obvious . . . exhaust leak, excessive,* beyond what is the Court's experience in ordinary vehicles emitting exhaust from the tail pipe. [¶] I think it was sufficient in that sense that *the sound was unusual,* and it certainly was unusual at the outset when we arrived there. [¶] . . . [I]t was *sufficiently unusual* to allow the officer to have properly acted within his discretion. I think were I a highway patrol officer, I wouldn't have cited for a loud muffler . . . that particular vehicle. But I think that the vehicle—the sound of what we heard in the parking lot just now was *unusual*[,] although . . . the code doesn't define what it means by 'unusual' when it says that. [¶] It was unusual and

---

[8]He later testified that when he first entered the courthouse parking lot, before the trial court arrived, the Bronco made noise at a level comparable to what he heard on January 24, but it quieted down as the engine continued to run.

sufficiently marginal that the officer is, I think, allowed to operate within an area of discretion." (Italics added.)[9]

Later, upon motion by Valencia, the trial court went again into the parking lot, and positioned itself at the distance Valencia had testified Gray was from the Bronco when the latter observed it at the gas station. (The distance was considerably greater than that testified to by Gray.) The Bronco had been running for about two minutes. The court had the bailiff set the accelerator at about half throttle. The court noted that the Bronco quieted down when this was done.

In denying the motion to suppress, the trial court said, "As I indicated in the finding that I made after the taking of the evidence in the parking lot, regarding the operation of the vehicle . . . were I the one cloaked with the opportunity to do things the highway patrol officers are asked and called upon to do, it would probably not have been my inclination to have cited somebody, or perhaps even stopped somebody for that particular muffler problem, and, indeed, *there's no doubt that there's a muffler problem* with respect to that particular car.

"It is, however, as I indicated, in the area of sufficiently gray area that I can't be particularly critical of an officer, other than, I suppose, a general sense of there's not enough to worry about. That is, we've got a lot of other more serious things to take care of, kind of reasoning.

"I think the officer was within reasonable limits in exercising his discretion in stopping that vehicle. I'm also satisfied in this case that the subsequent *stop of the vehicle, as indicated in the evidence and the questions* asked and the answers given revealed a sufficient cause for additional delay and detention by the officer. And I'm also satisfied that in this case, that the consents obtained were freely given. I'm satisfied that this case, indeed, the evidence suggested meets the criteria established by the Court in *United States versus Cortez*, as set out.

"I notice, with interest, that . . . *United States versus Lui* . . . refers to the use of . . . the [drug] profile alone as a reasonable suspicion to stop and question. That isn't the evidence in this case. In this case, I'm satisfied that the evidence, or that the stop was made for a reason unrelated to anything

---

[9]The trial court then invited argument by counsel. Valencia contended that the code did not set standards for defining "adequate or unusual." He also pointed out that Gray had not said that the exhaust was unusual or not adequate—Gray said it was loud. He went on to argue that the Bronco was not loud, but that it was "a little noisy, as all vehicles are when they are cold. But as they [*sic*] warm up, it becomes quiet." He also argued it would have been impossible for Gray to hear the exhaust on the freeway. The court denied the motion at that juncture.

having to do with a profile. . . . [L]ater on . . . observations of those things consistent with the profile was . . . sufficiently made, which justified, in my opinion, . . . prolonging [the] detention for the purposes of further investigation. I am satisfied in this case, that nearly every element, at least every material element, of [the] Officer['s] . . . testimony was confirmed by each of the Defendants who, I think, testified candidly and separate as to the circumstances of the consent given. Those are the areas of departure regarding the two testimonies.

". . . . . . . . . . . . . . . . . . . . . . . . . .

". . . [T]here's no reason to believe that either of the defendants in this case were making observations of the officer at all times, during the time that they were in the [gas s]tation, nor is there any reason to believe that the officer was, himself, making observations of the defendants at all times that they are in there. Hence, whether one saw one from one distance or another distance is interesting, but certainly not conclusive as to the distance that the officer was from the car.

"In this case, I'm satisfied that the stop was proper [and] that the detention was proper . . . ." (Italics added.)

ISSUES AND DISCUSSION

1. *The Initial Detention*

██ Valencia begins his attack on the propriety of the trial court's denial of the motion by claiming that the initial stop was pretextual, and, therefore, invalid. In support, he cites *U.S.* v. *Smith* (11th Cir. 1986) 799 F.2d 704.

In *Smith*, the court examined the propriety of the stop of a car that had been weaving six inches within one lane. (799 F.2d at pp. 706, 709.) The court held that the weaving did not constitute probable cause that a traffic violation had occurred. (*Id.*, at p. 709.) In response to the government's claim that the officer could have stopped the car on suspicion of drunken driving, the court said, ". . . [I]n determining when an investigatory stop is unreasonably pretextual, the proper inquiry . . . is not whether the officer *could* validly have made the stop[,] but whether[,] under the same circumstances[,] a reasonable officer *would* have made the stop in the absence of the invalid purpose. [Fn. omitted.] [¶] . . . [W]hat turns this case is the overwhelming objective evidence that [the officer] had no interest in investigating possible drunk driving charges: he began pursuit before he observed any 'weaving' and, even after he stopped the car, he made no investigation

of the possibility of intoxication. That he described the vehicle as being driven with an abundance of caution further indicates that the stop was unrelated to any possible concern with traffic safety. Based on this objective evidence, we conclude that a reasonable officer would not have stopped the car absent an additional, valid purpose. . . . [¶] The government contends that the initial stop was justified to investigate possible traffic violations, and that the subsequent detention of the car was justified to determine appellants' authority to drive it. Yet [the officer] summoned a drug dog even *before* he learned that the rental agency could not be contacted." (*Id.*, at pp. 709, 710-711, italics in original.)

Recently, in *People* v. *Miranda* (1993) 17 Cal.App.4th 917 [21 Cal.Rptr.2d 785], the test articulated in *Smith* was described as the minority position and the following test, which was adopted by the *Miranda* court, was denoted the majority view: ". . . [T]he inquiry focuses on whether the officer was legally authorized to make an arrest and conduct a search. If, in the abstract, the officer does no more that he or she is legally permitted to do, regardless of the subjective intent with which it was done, the arrest and search are objectively reasonable and constitutionally proper. (*U.S.* v. *Mitchell* (D.C. Cir. 1991) 951 F.2d 1291, 1295 [293 App.D.C. 24]; *U.S.* v. *Cummins* (8th Cir. 1990) 920 F.2d 498, 500-501; *U.S.* v. *Trigg* [(7th Cir. 1989)] 878 F.2d [1037] at p. 1041; *U.S.* v. *Causey* [(5th Cir. 1987)] 834 F.2d [1179] at pp. 1084-1085; *U.S.* v. *Hawkins* (3d Cir. 1987) 811 F.2d 210, 212-215.)" (*Id.*, at p. 925.)

*Miranda* soundly criticized the "reasonable officer" test of *U.S.* v. *Smith* as follows: "In essence, the . . . test asks courts to determine whether the arresting officer's conduct deviated from the usual practice of a 'reasonable officer.' To do this in a given case, the court must inquire into how police normally treat the particular Vehicle Code violation on which the stop was based. This 'usual practice' is then elevated to a standard of procedure which the 'reasonable officer' would have followed. [Citation.] However, such a case-by-case, police-department-by-police-department approach fails to provide the consistency and predictability officers need to meaningfully understand their obligations under the Fourth Amendment.

". . . . . . . . . . . . . . . . . . . . . . . .

"We next note that, in essence, the 'reasonable officer' test tries to divine what a reasonable officer's subjective motivation would be under similar circumstances. However, a significant factor in this determination is the arresting officer's invalid purpose, i.e., his or her subjective investigative motivation. Thus, although the 'reasonable officer' test purports to be objective, the analysis is not so different from a purely subjective approach to the

question of whether police conduct was unreasonable under the Fourth Amendment. For this reason, the test has been rejected as inconsistent with the United States Supreme Court's direction to analyze police conduct without regard to the individual officer's subjective motivation. [Citation.]

"Finally, we agree with the observation that this test places police 'under the apprehension that their actions—which often require the exercise of great discretion—would be subject to misinterpretation months later in the antiseptic atmosphere of the courtroom.' [Citation.]" (*People* v. *Miranda, supra*, 17 Cal.App.4th at pp. 928-929.)

While Valencia cited *U.S.* v. *Smith* in his moving papers below, he there failed to appreciate and articulate, and apparently still does, the subtle, yet important (for adherents to the test he wishes us to embrace) distinctions between the minority "reasonable officer" test and the majority view. As a consequence, evidence along these lines was never developed at the hearing, the trial court was not called upon to apply the "reasonable officer" test and it, in fact, did not. Our only recourse, then, if we choose to adopt the latter standard, is to see if the findings the trial court made here, which are supported by substantial evidence (*People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436]), somehow fit within that test.

We believe the better approach, however, is to join with our colleagues, who are responsible for *Miranda*, and affirm our adherence to the majority view. We do this not only because of the philosophical reasons so well stated in *Miranda*, but also, *in this particular case*, because of the absence of evidence produced at the hearing which would have served as a basis for the trial court's determination whether the "reasonable officer" standard had been met. In other words, we are in no position to review what was not decided below, and the applicability of this standard was not.

We also feel compelled to comment that, contrary to Valencia's contention, the facts here are nothing like those in *U.S.* v. *Smith*.

A response to each of the points Valencia raises in his brief is, at this time, appropriate. First, Valencia contends that Gray was surveilling him and his companions. Gray denied that he was and the trial court found that he was not. Therefore substantial evidence supports the finding.

Next, Valencia contends that the Bronco was really not in violation of Vehicle Code section 27150 because, since the trial court could not conclude that the noise was loud, it must have also concluded that it was not excessive. However, the trial court denied Valencia's motion to dismiss,

brought on the basis that the exhaust was not loud, finding that "[w]ithin the meaning of 27150(a)[,] the muffler . . . was not 'adequate,' " and there was an "obvious exhaust leak," which was "excessive[,]" "it was louder than a properly operating new or newer" vehicle and "the sound was unusual. [¶] There's no doubt that there's a muffler problem . . . ." Since the section requires that "an adequate muffler [be] in constant operation and properly maintained to prevent any excessive or unusual noise," it is clear that the trial court's findings, which were supported by its own observations of the Bronco, adequately supported its conclusion that a violation of the section had taken place.[10]

Next, Valencia makes much of the trial court's statement that if it had been in Gray's shoes, it would not have made the stop for a violation of Vehicle Code section 27150. Valencia attempts to graft this statement onto the "reasonable policeman" standard and conclude that if the trial court would not have stopped the Bronco, Gray should not have either. First, Valencia misses the mark by asserting that the trial court's subjective feèlings establishes the "reasonable officer" standard. Absent evidence what a reasonable officer would do, the court below was in no position to make this assessment. Second, the point of the remark was that, even though the court would not have done what Gray did, it was still reasonable, under the circumstances, for Gray to stop the Bronco, which is the standard enunciated in *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].

Finally, Valencia points to the fact that Gray did not cite him for a violation of Vehicle Code section 27150. However, Gray explained why he did not, and apparently the trial court believed him, as it found that the stop was not made to search for drugs.[11]

Applying the standard enunciated in *Miranda* and embraced by a majority of courts, we conclude that, in terms of the initial stop, Gray did no more than he was legally authorized by Vehicle Code section 27150 to do. On the

---

[10]Valencia contends that the People are attempting to change the reason for the stop from Gray's categorization of the exhaust as loud to the trial court's conclusion that it was inadequate and produced unusual noise. The statute does not address loud mufflers, per se—it prohibits precisely what the trial court said it did. Gray's shorthand, layman's reference to the violation does not mean that the reason for the stop was not genuine and did not fall within the meaning of the statute.

[11]Valencia also contends, in his opening brief, that "Gray . . . only briefly spoke to [Valencia's brother] once regarding the 'loud exhaust . . .' . . . ." Yet, in the same brief, he states, "At no time during the stop did Officer Gray mention anything about a loud exhaust or even why he had stopped the Bronco." Our recollection of the testimony is consistent with this latter view.

record before us, we are unable to apply the "reasonable officer" test and to reach an intelligent conclusion as to whether it was met here.

## 2. *Prolongation of the Initial Detention*

Valencia contends the prolongation of the initial detention was improper. In so doing, he ignores and misconstrues a number of important facts.

Once having properly detained a vehicle, an officer may ask for and examine the license of the driver and the registration for the vehicle, and may remove the driver from the car in order to do these things. (*Pennsylvania* v. *Mimms* (1977) 434 U.S. 106, 108 [54 L.Ed.2d 331, 335, 98 S.Ct. 330]; *People* v. *McGaughran* (1979) 25 Cal.3d 577, 582 [159 Cal.Rptr. 191, 601 P.2d 207].) If the driver cannot produce his or her license, or satisfactory proof of identity, or the registration, then the officer may expand the scope of the detention, depending on the circumstances. (*People* v. *Webster* (1991) 54 Cal.3d 411, 430-431 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Monroe* (1993) 12 Cal.App.4th 1174, 1182 [16 Cal.Rptr.2d 267]; *People* v. *Grant* (1990) 217 Cal.App.3d 1451, 1459 [266 Cal.Rptr. 587].)

Contrary to Valencia's assertion, Gray did not receive satisfactory proof of the brother's identity or the ownership of the Bronco at the scene. Although the wants check for Valencia's brother came back negative, Gray was not able to verify that the former had a driver's license until he was back in his office and ran it on the Department of Motor Vehicles teletype. Gray explained the significance of the absence of this information during the following colloquy: "Q [by defense counsel:] [The reply to the wants check] also conveys to you that the suspect is telling you the truth as to his name and date of birth; isn't that true? [¶] A [by Gray:] No, sir. [¶] . . . [I]f they are telling me a particular name and date of birth and they've told me that they have a driver's license out of California, [the driver's license check] should come back with a match on that particular name and date of birth. And also the physical description on that name and date of birth should come back and match the party that you have stopped. [¶] In this case I was still waiting for the driver's license check to come back. They had not confirmed that [Valencia's brother] even had a driver's license or if there was a record for it yet. [¶] Q [by defense counsel:] . . . But at the same time they didn't tell you [that] the name and date of birth [Valencia's brother gave] don't match up, right? [¶] A [by Gray:] They can't. They wouldn't know that until their driver's license check comes back." Also contrary to Valencia's assertion, there was no evidence that the Bronco had not been stolen. The system

for checking vehicles was not operating, so there was no way to determine ownership or status.[12]

Gray was within his discretion in insisting on documentation of who Valencia's brother was, rather than simply relying on the word of Valencia and Nunez. (*People* v. *Monroe*, *supra*, 12 Cal.App.4th at p. 1182.) The fact that Gray had not been told that the Bronco had been reported stolen did not establish that it had not, especially since the system was down and there was no proof that Valencia was the rightful owner.

Valencia's reliance, then, on *U.S.* v. *Guzman* (10th Cir. 1988) 864 F.2d 1512, is misplaced, as therein, there was confirmation that the driver had a valid license and that the car had not been stolen.

As Gray stated himself during the hearing, "I went from a routine . . . traffic stop for a loud exhaust to the driver . . . not having a driver's license or any identification[,] which [created] . . . the possibility [that] . . . he ha[d] given me false information as to who he [wa]s. [¶] Also, the registered owner . . . of the vehicle was not even there. So [then it became] possibly a stolen vehicle [case]. After talking to the parties in the vehicle with the conflicting stories and . . . they're eastbound on I-40 [(a major drug pipeline)] out of [Los Angeles (where 50 percent of the cocaine in the country originates)], going on a [long] trip[, but staying only a short time, with one bag for all three men and a blanket in the Bronco, and the driver appearing nervous while being followed by the Highway Patrol, which training and experience has shown to be indicators of transporting drugs], [I began to] think . . . [that] they may be possibly trafficking . . . ."[13]

There was no impropriety in Gray's extension of the detention to attempt to obtain Valencia's brother's driver's license and to satisfy himself that the Bronco was not stolen.

### 3. *Search of the Bronco's Interior*

Ignoring the trial court's finding that the Bronco was searched pursuant to valid consent by all three men, Valencia argues that Gray undertook the search based only on his hunches about drug trafficking and pursuant to the

---

[12]Gray testified that he had not received a report that the Bronco had been stolen. However, besides the fact that the system was down, he, unlike many local police officers, did not have "hot sheets," i.e., daily reports on recently stolen cars.

[13]Valencia argues that Gray was unjustified in relying upon the factor that he and his companions were driving someone else's vehicle as an indicator of drug trafficking because, here, Valencia claimed ownership of the Bronco. We agree that when Valencia did so, this indicator ceased to exist, however, the numerous other ones set forth above remained.

stop for the exhaust. To respond to Valencia's argument would entail a rehashing of the facts and conclusions we have already stated. Suffice it to say that Valencia does not claim that the search was not pursuant to the consents given. He does allege that the consents were invalid, because they followed an improper stop. Having disposed of this contention previously, we need not address it again.

The time frame testified to by Gray and the off-duty officer shows that the detention was not unduly long, that it continued apace as more indicators of illegal activity came about and that it culminated in Valencia and the others freely consenting to the search. The Penal Code section 1538.5 motion, therefore, was properly denied.

## DISPOSITION

The judgment is affirmed.

Dabney, J., and Hollenhorst, J., concurred.