Filed 9/24/20  P. v. Xaypanya CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> DOUANGTA XAYPANYA, <br><br>     Defendant and Appellant. | D075624 <br><br><br> (Super. Ct. No. SCD279018) |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed in part, reversed in part, remanded with directions.

Shay Dinata-Hanson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

# I

## INTRODUCTION

Douangta Xaypanya was charged with possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 1) and with unlawfully possessing ammunition as a person prohibited from possessing a firearm (Pen. Code, § 30305, subd. (a)(1); count 2). Xaypanya moved to suppress the firearm and ammunition recovered in a pat-down search. After the court denied the motion, Xaypanya pleaded guilty as charged. He admitted he knowingly and unlawfully possessed a firearm and ammunition as a convicted felon. He admitted he served four prior prison terms and did not remain free from prison for five years. (Pen. Code, §§ 667.5, subd. (b), 668.) The court sentenced Xaypanya to the middle term of two years for count 1 and stayed a two-year term for count 2 pursuant to Penal Code section 654. The court imposed two consecutive one-year terms for two of the four prison priors for a total term of four years in state prison. The court struck the punishment for the third and fourth prison prior allegations.

On appeal, Xaypanya contends the court erred in denying his motion to suppress and asks for reversal on that basis. Alternatively, he contends we should strike from his sentence the two consecutive one-year prison prior terms pursuant to Senate Bill No. 136, which amended Penal Code section 667.5, subdivision (b) and eliminated enhanced punishment for prison priors not involving sexual assault. (Stats. 2019, ch. 590, § 1.) The People contend the court properly denied the motion to suppress. They agree Senate Bill No. 136 applies retroactively, but contend the appropriate remedy is to remand the matter for resentencing.

We conclude the trial court properly denied the motion to suppress. However, we remand the matter to the trial court for resentencing in light of Senate Bill No. 136.

## II

## BACKGROUND

### A

Officer Stanley, a member of the San Diego Police Department's gang suppression team, testified at the motion to suppress hearing. On the night of October 14, 2018, Stanley and his partner, Officer Diaz, made a traffic stop of a known gang member who said he did not have his wallet because he was robbed in an alley next to the Morgan Hotel, which was nearby. The gang member said he was awakened from sleeping in his car and was robbed by a few people. He did not give clear descriptions of the individuals. He also did not say when he was robbed.

About an hour later, the officers were in the area of the Morgan Hotel and drove into the alley. The Morgan Hotel is known for criminal activity such as prostitution as well as gang and drug activity. Officer Stanley worked in that area about three times a week.

As the officers drove into the hotel parking lot, they noticed a male standing on the driver's side of a parked vehicle. When he saw the officers, he appeared to panic. A couple of other people were standing on the passenger side of the vehicle.

The male standing by the driver's door looked at the officers and then jogged briskly to the other side of the vehicle and entered the passenger seat. The other individuals walked away at a normal rate. In a video taken on a body worn camera during the encounter, Officer Diaz said, "It was like a grenade went off once we hit the alley.… Everybody skedaddled."

3

The officers parked their patrol vehicle and got out to contact the occupants of the parked vehicle. Officer Stanley said they wanted to talk to the individuals in the car because they received a report about a robbery that was possibly gang related, the area was known for criminal activity, and the actions of the male suggested there was some illegal activity going on. The incident occurred around 10:45 p.m. The officer stated illegal activity is often conducted at night.

The officers did not activate the overhead lights and sirens. The patrol vehicle partially blocked the alley entrance to the parking lot, but another entrance to the lot was clear. There was considerable distance between the patrol vehicle and the parked vehicle. Other officers arrived at the scene within approximately two minutes.

Officer Stanley approached the driver's side of the parked vehicle. Xaypanya was in the driver's seat. Officer Stanley described his contact with Xaypanya as "light." He asked Xaypanya how it was going. Xaypanya did not try to drive away.

Officer Diaz approached the passenger side of the vehicle. On the way to the car, Officer Diaz asked two individuals who were nearby if they were with the car and if they minded "hanging out over here" near some steps. When he got to the passenger window, Officer Diaz asked the person who had just entered the car how he was doing.

When asked for identification, the passenger said he did not have a form of identification. The passenger gave his name. A female and a five-year-old child were seated in the back of the vehicle.

Both Xaypanya and the passenger appeared nervous, although the passenger was more noticeably nervous. Xaypanya's body language was pretty calm, but the passenger was fidgety and did not appear to know how to

sit. The officers could not get straight answers. Based on the nervous behavior, it appeared to Officer Stanley that there was something in the vehicle they were worried the officers would discover.

Officer Stanley asked Xaypanya for his identification and his name because he was in the driver's seat. Xaypanya provided an identification card instead of a driver's license. Officer Stanley said the passenger was "trippin'" and asked Xaypanya, "what's up with your boy dude?"

Officer Stanley immediately recognized Xaypanya's last name because he had arrested some of Xaypanya's brothers and relatives for crimes involving handguns. Those relatives were members of a gang known as Oriental Boy Soldiers (OBS). This connection threw up a red flag and Officer Stanley thought there was a greater chance there could be a firearm in the vehicle.

The fact that Xaypanya provided an identification card rather than a driver's license also raised suspicion. When Officer Stanley asked about the license, Xaypanya initially lied saying it was in another pair of pants. On further inquiry Xaypanya admitted the license was no good. It is illegal to drive without a license, but Xaypanya was seated in the driver's seat.

Officer Stanley suspected Xaypanya was a member of the gang about a minute into the contact after he learned Xaypanya's name. Xaypanya eventually identified himself with an OBS gang moniker, 'Lil Brownie. Officer Stanley also believed the passenger was a member of the OBS gang, which is known to be involved with firearms and robberies. This factor caused Officer Stanley to become concerned for his safety. He was concerned there was a weapon in the car.

Officers Stanley and Diaz asked several times if there were weapons in the car. Xaypanya and the passenger acted very nervous. When asked if

they used to "roll strapped," Xaypanya did not answer clearly and said he "just got out." Officer Stanley asked if there were "straps" or guns in the car. Xaypanya was again evasive.

Officer Stanley believed a pat-down was necessary under the circumstances. They had two members or associates of a gang known to have firearm priors, a five-year-old in the back seat, and a report of a recent robbery. Since Xaypanya's responses to questions about a weapon were vague, Officer Stanley thought there would be a weapon in the vehicle.

As Officer Diaz got the passenger out of the car, Officer Stanley again asked the passenger if he had a gun. The passenger said no, but looked immediately at Xaypanya. Officer Stanley said, "Why you looking at him?" Xaypanya was evasive and looked away. Officer Stanley then said, " 'You guys are trippin', bro, for somethin'."

During the pat-down of Xaypanya, Officer Stanley felt what appeared to be a handgun. When Officer Stanley asked if he would find anything illegal, Xaypanya said, "You already touched it." Officer Stanley pulled out a loaded 9-millimeter handgun.

B

In ruling on the motion to suppress, the court noted the report of the robbery was vague as to time and did not create exigence for a search. Rather, it went to the historical background of the location.

The court determined when the officers first pulled up behind the vehicle without lights or siren, it did not constitute a traffic stop or a detention because a route to exit onto a main street remained open at the north end of the parking lot.

The encounter evolved into a detention when other officers arrived and blocked the exit from the parking lot. By the time there was a detention, the

6

officers had seen the passenger scurry to the other side of the car when he saw officers arriving.  As the officers approached and asked for identification, the passenger continued to act in a suspicious manner.  Xaypanya did not provide a driver's license.  Xaypanya initially lied about the driver's license before admitting there was a problem with the license.  When the officers asked if there were weapons in the car, the individuals in the car did not deny the presence of weapons and the passenger looked at Xaypanya in a nervous manner.

The court noted they also ran a computer check, which returned some information about gang activities.  Xaypanya provided a gang moniker and he was with another member of the OBS gang.  Xaypanya lied about his driver's license.  There was evasive conduct and a failure to respond to questions about weapons.  The court stated, "as a result, for purposes of officer safety, the officers then took … [the passenger] and Mr. Xaypanya out of the vehicle, conducted a pat-down search for weapons and, in the course of the pat-down search, found the firearm."

After considering the totality of the circumstances, the court denied the motion to suppress the evidence recovered in the pat-down concluding the pat-down was reasonable for officer safety.

III

DISCUSSION

A

1

"Both the federal and state Constitutions prohibit unreasonable searches and seizures.  (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13.)  'In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal

7

constitutional standards.' [Citation.] ' "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.' " ' (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1041.)

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) " '[A]ny assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account " 'all of the circumstances surrounding the incident' " in each individual case.' " (*People v. Brown* (2015) 61 Cal.4th 968, 980 (*Brown*).)

An officer may detain an individual if the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, warrant the intrusion. (*Terry v. Ohio* (1968) 392 U.S. 1, 21 (*Terry*); *People v. Hernandez* (2008) 45 Cal.4th 295, 299 [must have specific, articulable facts for believing detained person has committed or is about to commit a crime].) Consensual encounters do not trigger Fourth Amendment scrutiny and require no articulable suspicion the person has committed or is about to commit a crime. (*In re Manuel G., supra,* 16 Cal.4th at p. 821.)

"[T]he reasonable suspicion standard of *Terry*[*, supra,* 392 U.S. 1] is not a particularly demanding one, but is, instead, 'considerably less than proof of wrongdoing by a preponderance of the evidence.' [Citation.] 'In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law

8

enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.' [Citation.] Further, as the high court repeatedly has explained, the possibility of innocent explanations for the factors relied upon by a police officer does not necessarily preclude the possibility of a reasonable suspicion of criminal activity. [Citations.] In determining whether a search or seizure was supported by a reasonable suspicion of criminal activity, ' "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." ' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 146–147 (*Letner*).)

2

Evidence obtained from unreasonable government searches and seizures is inadmissible. (*People v. Williams* (1999) 20 Cal.4th 119, 125.) "A defendant may move to suppress evidence under section 1538.5 on grounds that a search without a warrant was unreasonable. A warrantless search is presumptively unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search." (*People v. Simon* (2016) 1 Cal.5th 98, 120 (*Simon*).)

"The trial court ' "find[s] the historical facts, select[s] the rule of law, and appl[ies] it to the facts in order to determine whether the law as applied has been violated." ' " (*Letner, supra,* 50 Cal.4th at p. 145.) We review de novo a trial court's resolution of the legal questions resolved in a suppression motion, and we review the trial court's resolution of factual issues under the more deferential substantial evidence standard. (*Ibid.*) We are concerned with the propriety of 'the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision.' " (*People v. Vargas* (2020) 9

9

Cal.5th 793, 814; S*imon*, *supra*, 1 Cal.5th at p. 120 [based on the facts found by the trial court, we exercise independent judgment to determine if the search was reasonable].) We "view the evidence in a light most favorable to the order denying the motion to suppress" and " ' "must accept the trial court's resolution of disputed facts and its assessment of credibility." ' " (*People v. Frederickson* (2020) 8 Cal.5th 963, 1010.)

3

Xaypanya contends (1) the court erred in determining detention did not occur when the first officers arrived in the parking lot and approached the parked car, (2) even if detention occurred when other officers arrived there was no evidence to give rise to a reasonable suspicion to detain at that point, (3) the factors relied upon by the officers for detaining Xaypanya did not meet the reasonable suspicion standard, and (4) the pat-down search was illegal because they did not have a reasonable suspicion Xaypanya was armed and dangerous. We disagree with each contention. The encounter was quite fluid and, as the superior court determined, what began as a consensual encounter evolved into a detention based upon reasonable suspicion of criminal activity and ultimately culminated in a legal pat-down search.

The first officers on the scene knew criminal activity, including robberies, prostitution, and gang activity, occurred at the area around the hotel. This included a relatively recent robbery of someone who alleged they were robbed in a car in the parking lot. Officer Diaz described the scene when they entered the parking lot as though "a grenade went off." The passenger, who had been standing next to the driver's door, appeared to panic and "skedaddled" to the opposite side of the car as though he was trying to hide. A couple of people who were standing near the passenger side of the vehicle, moved at a normal pace and appeared to be "playing it cool." It was

10

late at night, when criminal activity usually occurs.  The officers decided to talk to the individuals in the car.

A " 'brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.' " (*Letner*, *supra*, 50 Cal.4th at p. 149.)  However, the officers did not park in such a way that they prevented the vehicle from exiting the lot. (*People v. Wilkins* (1986) 186 Cal.App.3d 804, 809.)  The officers parked their patrol car some distance from the parked vehicle and approached to ask the occupants questions based upon the furtive behavior they observed when they entered the lot.

A "detention does not occur when a police officer merely approaches an individual on the street and asks a few questions." (*In re Manuel G., supra,* 16 Cal.4th at p. 821.)  "An officer may approach a person in a public place and ask if the person is willing to answer questions.  If the person voluntarily answers, those responses, and the officer's observations, are admissible in a criminal prosecution." (*Brown, supra*, 61 Cal.4th at p. 974.)  The fact that the officers illuminated the area with headlights from the patrol vehicle and used flashlights to see the hands of the vehicle's occupants, did not raise the initial contact to a detention.  "While the use of high beams and spotlights might cause a reasonable person to feel himself the object of official scrutiny, such directed scrutiny does not amount to a detention." (*People v. Perez* (1989) 211 Cal.App.3d 1492, 1496.)  This was not like cases where officers went to an area known for criminal activity to flush out, stop, and search individuals trying to avoid police on a hunch they may have drugs or weapons.  (See *People v. Aldridge* (1984) 35 Cal.3d 473, 476, 479 [detention of individuals who left an area known for drug transactions when officers arrived was not

11

justified based only on the time of night, the high-crime area, and avoidance of police]; *People v. Flores* (2019) 38 Cal.App.5th 617, 622–623 [officers surrounded an alley known for criminal activity and improperly detained and searched a defendant who walked toward them out of the alley because he was " 'the closest one we could get' "].)

The officers did not pull Xaypanya and his companion out of the car immediately upon arrival to search them based on the reported robbery, the high-crime nature of the area, and the initial actions of the passenger to detain Xaypanya. They approached to have a conversation with the individuals based on unusual behavior at a time and place suspicious for criminal activity. Objective reasonable suspicion developed and grew throughout the encounter based on the conduct of both the passenger and Xaypanya as the officers talked with them. Both Xaypanya and the passenger acted nervous during the initial contact and it appeared to Officer Stanley that there was something in the vehicle they were worried the officers would discover.

According to the videos, the other officers arrived between two and three minutes after Officers Stanley and Diaz approached the vehicle. When Officer Stanley asked Xaypanya for his identification, Xaypanya produced an identification card, but not a driver's license. This led Officer Stanley to suspect Xaypanya did not have a valid license to drive the vehicle. When asked about the license, Xaypanya initially lied, saying it was in another pair of pants before eventually admitting there was a problem with the license. Lack of a valid license and lying about it provided a basis to prolong his detention, to confirm his identity and because it is illegal to drive without a valid license. (*People v. Valencia* (1993) 20 Cal.App.4th 906, 918.)

Officer Stanley immediately recognized Xaypanya's name as associated with family members who were part of a street gang known for possessing weapons and committing robberies. Upon further inquiry, Xaypanya admitted he was known by a gang moniker and the passenger was identified as a member of the same gang. When the officers inquired about whether there were weapons in the vehicle, both the passenger and Xaypanya acted evasive and did not respond clearly. When pressed, the passenger looked at Xaypanya. The officers expressed concern about their safety and the safety of the child in the backseat of the vehicle.

Given the totality of the circumstances, we agree it was reasonable for the officers to talk to the occupants of the vehicle when they arrived. Based on their unusual and evasive conduct, it was reasonable for the officers to detain them to determine if a crime was in progress. When they could not get a straight answer about the presence of weapons, it was reasonable to conduct a pat-down search for officer and public safety. The court properly denied the motion to suppress.

B

On October 8, 2019, the Governor signed Senate Bill No. 136, effective January 1, 2020. This legislation amended Penal Code section 667.5, subdivision (b), eliminating one-year enhancements for all prior prison terms served except for those involving sexually violent felonies.

Xaypanya's alleged prior prison terms involved drug charges and burglary from or theft of vehicles. None involved sexually violent felonies. Thus, Xaypanya contends the statutory amendment applies retroactively and his prison priors must be stricken because they do not qualify to enhance his sentence.

The People agree the statutory amendment applies retroactively and the priors should be stricken. (*People v. Brown* (2012) 54 Cal.4th 314, 323–324; *In re Estrada* (1965) 63 Cal.2d 740, 745.) However, the People contend the matter should be remanded to allow the superior court to consider the sentence anew since the court may have made sentencing choices in part because of the priors.

We agree with the People that limited remand is appropriate in this case for the court to resentence Xaypanya in light of the amendment to Penal Code section 667.5, subdivision (b). (See *People v. Stamps* (2020) 9 Cal.5th 685, 705, 708–709 [limited remand appropriate for court to reconsider sentence in light of newly conferred authority under Pen. Code, § 1385 despite plea deal]; *People v. Hubbard* (2018) 27 Cal.App.5th 9, 13 [remand under Prop. 36 permitted court to consider all aspects of the original sentence]; *People v. Hill* (1986) 185 Cal.App.3d 831, 834 ["When a case is remanded for resentencing by an appellate court, the trial court is entitled to consider the entire sentencing scheme."].)

IV

DISPOSITION

The judgment is reversed and remanded for the limited purpose of allowing the trial court to reconsider the sentence in light of the recent amendment to Penal Code section 667.5, subdivision (b). In all other respects, the judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

O'ROURKE, J.